UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CASSANDRA SELLARDS-RECK,

                           Petitioner,

        v.

DAVID SHOOK, et al.,

                           Respondents.

Case No. C23-5516-MJP-SKV

REPORT AND RECOMMENDATION

I.        INTRODUCTION

Petitioner Cassandra Sellards-Reck has filed a petition for writ of habeas corpus under

the habeas provision of the Indian Civil Rights Act ("ICRA"), 25 U.S.C. § 1303, seeking relief

from a 2023 Cowlitz Tribal Court judgment and sentence for assault in the second degree.  *See*

Dkt. 1.  Respondents have filed an answer asking the Court to deny the petition.  Dkts. 21–23.

The Court, having carefully reviewed the parties' submissions and the balance of the record,

finds that Petitioner has failed to exhaust her tribal court remedies and that the petition does not

state a claim for habeas relief.  Accordingly, the Court recommends that this action be dismissed

with prejudice.[1]

---

[1] Petitioner has not asked for an evidentiary hearing and the Court does not deem one necessary.

1              II.    FACTUAL & PROCEDURAL BACKGROUND

2          This dispute arises out of a physical assault committed by Petitioner against Respondent

3  Steve Barnett, both members of the Cowlitz Tribal Council.  *See* Dkt. 1 at 2.  Following a tribal

4  council meeting on September 10, 2022, Petitioner's hand made contact with the torso of

5  Respondent Barnett.  *Id.* at 7.  Petitioner was subsequently charged under Cowlitz law with

6  assault in the second and third degrees.  Dkt. 21-1 at 75.

7          Petitioner, represented by counsel, exercised her right to a jury trial in Cowlitz Tribal

8  Court, *see generally* Dkt. 21-1, which was established by tribal council ordinance in 2018, Dkt.

9  21-8.  The judge presiding over Petitioner's case was appointed by the tribal council to the

10  Cowlitz Tribal Court prior to December 2021, and has been unanimously reappointed at least

11  two times since.  *See* Dkts. 21-6–21-7.

12          The court heard argument on motions in limine, Dkt. 21-1 at 89–101; 103–06; 111–14,

13  and conducted voir dire, *id.* at 113–24; 154–209.  Petitioner testified in her own defense, *id.* at

14  599–634; 666–75, and presented a "defense of others" defense to the crime alleged, *see, e.g.*, *id.*

15  at 42.  After hearing evidence over four days, the jury found Petitioner guilty of assault in the

16  second degree.  *Id.* at 730; *see also* Dkt. 15-2.  The tribal court sentenced Petitioner to 180 days

17  of incarceration, with 30 days to be served under home confinement and the rest suspended,

18  along with community service, anger management, one year of probation, and a one-year no-

19  contact order with Respondent Barnett.  *See* Dkt. 15-2.

20          In accordance with Cowlitz Tribal Code ("CTC"), *see* CTC 27.05.020, on May 19, 2023,

21  Petitioner appealed her conviction to the Cowlitz Tribal Court of Appeals, Dkt. 15-3.  On May

22  31, 2023, Petitioner's appellate counsel emailed the tribal court clerk inquiring into the rules and

23  procedures governing the court of appeals, and asking for a copy of the trial court record.  Dkt.

27 at 14.  The clerk responded the same day, directing counsel to the CTC, and informing him that she would send him additional court policies and procedures not currently publicly available, as well as a copy of the lower court record.  *Id.* at 13.  The next day, Petitioner emailed the tribal court clerk requesting that counsel be appointed in her appeal due to financial hardship.  *Id.* at 9–10.  That same day, the clerk responded that she would forward Petitioner's request to the appellate judge assigned to her case.  *Id.* at 9.

On June 27, 2023, by unanimous tribal council resolution, the Tribe appointed eight judges to act as associate judges on the court of appeals in an as-needed capacity.  Dkt 27 at 33.

Thereafter, on July 25, 2023, the court of appeals ordered the Tribe to appoint an attorney to represent Petitioner at her partial expense.  Dkt. 21-4.  This order was communicated to Petitioner's appellate counsel on July 27, 2023.  Dkt. 27 ¶ 9.  The tribal court clerk informed Petitioner's appellate counsel that he could remain Petitioner's counsel of record if he accepted the terms of the Tribe's public defender contract.  *Id.* ¶ 10; *id.* at 18.  As of September 14, 2023, counsel alleges he has yet to receive a copy of the contract, despite asking that it be provided.  *Id.* ¶ 12.

On or around July 19, 2023, Petitioner filed a motion to adopt rules and order transcripts in the court of appeals.  Dkt. 27 ¶ 8; *id.* at 19.  On August 14, 2023, the tribal court clerk contacted counsel to schedule a hearing, *id.* ¶ 11; *id.* at 25, and on August 29, 2023, the court of appeals held a hearing, *id.* ¶¶ 14–16.  On September 5, 2023, following that hearing, the court of appeals entered an order stating that the court "of course, [would] use the Cowlitz appellate rules[,]" and that it would also "supplement with the Washington State rules of appellate procedure."  Dkt. 21-5.  The order further noted that the court would allow "court cases from Cowlitz Tribe, of course, and [would] follow precedent[,]" and provided that other cases could

be cited, which the court would use as "persuasive precedent." *Id.* Finally, the order clarified additional procedural matters, including the timing for the filing of the verbatim report of proceedings, exhibits, clerk's papers, and briefing, as well as the amount of time allotted to each party for oral argument. *Id.* As of September 14, 2023, Petitioner's appellate counsel alleges he has yet to receive a copy of this order. Dkt. 27 ¶ 16. Petitioner's appeal remains pending. *See* Dkt. 1 at 12–16.

On June 7, 2023, Petitioner petitioned this Court for a writ of habeas corpus under the habeas corpus provision of ICRA, 25 U.S.C. § 1303. Petitioner named as Respondents Judge Christine Pomeroy, the tribal court judge; Jon Pound, the Tribe's Director of Public Safety; and Steve Barnett, the victim of the assault in question and the Tribe's Chairperson.[2]

### III.     GROUNDS FOR RELIEF

Petitioner presents three claims for federal habeas relief in her petition:[3]

1.     Whether this Court Should Grant the Petition for Habeas Corpus Because the Tribal Court Did Not Maintain a Recording of the Trial;

2.     Whether this Court Should Grant the Petition for Habeas Corpus Because of Systemic Constitutional Problems in the Tribal Court System; and

---

[2] Petitioner also named as Respondent, David Shook, the Director of Jail Services for Clark County, Washington. *See* Dkt. 1. The proper respondent in a tribal habeas action is the person who has "an interest in opposing the petition if it lacks merit, and the power to give the petitioner what he seeks if the petition has merit—namely, his unconditional freedom." *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 899 (2d Cir. 1996) (quoting *Reimnitz v. State's Attorney of Cook County*, 761 F.2d 405, 408–09 (7th Cir. 1985)). Because the petition does not allege any ongoing role by Clark County in detaining Petitioner, and therefore any ability for Clark County to grant Petitioner her freedom, Respondent Shook is not a proper respondent in this action and should be dismissed with prejudice.

[3] In a declaration filed in support of the petition, Petitioner also alludes to an ineffective assistance of counsel claim, Dkt. 2 at 12; however, because Petitioner did not plead this claim, the Court will not address it.

REPORT AND RECOMMENDATION - 4

3.      Whether this Court Should Grant the Petition for Habeas Corpus Because of

Constitutional Errors Specific to this Trial.

Dkt. 1 at 12.

IV.    DICUSSION

The Cowlitz Indian Tribe is a "'distinct, independent political communit[y], retaining

[its] original natural rights' in matters of local self-government." *Santa Clara Pueblo v.*

*Martinez*, 436 U.S. 49, 55 (1978) (citations omitted).  Indian tribes "are not bound by the United

States Constitution in the exercise of their powers, including their judicial powers . . . ." *Means*

*v. Navajo Nation*, 432 F.3d 924, 930 (9th Cir. 2005).  As a result, "tribal proceedings do not

afford criminal defendants the same protections as do federal proceedings." *United States v.*

*Percy*, 250 F.3d 720, 725 (9th Cir. 2001).  In 1968, Congress utilized its ability to "limit, modify

or eliminate the powers of local self-government which the tribes otherwise possess," to pass

ICRA and extend to tribes most of the civil protections in the Bill of Rights.  *See Santa Clara*

*Pueblo*, 436 U.S. at 56–57.

Habeas corpus provides the exclusive remedy for a party to enforce ICRA in federal

court.  *See Santa Clara Pueblo*, 436 U.S. at 66–67; 25 U.S.C. § 1303 ("The privilege of the writ

of habeas corpus shall be available to any person, in a court of the United States, to test the

legality of his detention by order of an Indian tribe.").  Prior to pursuing a habeas claim in federal

court, however, a petitioner generally is required to exhaust her claims with the appropriate tribal

court, *see, e.g.*, *Selam v. Warm Springs Tribal Corr. Facility*, 134 F.3d 948, 953 (9th Cir. 1998),

because "[t]he federal policy of promoting tribal self-government encompasses the development

of the entire tribal court system, including appellate courts[,]" *Iowa Mut. Ins. Co. v. LaPlante*,

480 U.S. 9, 16–17 (1987).   "Considerations of comity, along with the desire to avoid procedural

1    nightmares, have prompted the Supreme Court to insist that 'the federal court stay[ ] its hand

2    until after the Tribal Court has had a full opportunity . . . to rectify any errors it may have

3    made.'" *Id.* (quoting *Nat'l Farmers Union Ins. Cos. v. Crow Tribe*, 471 U.S. 845, 857 (1985)).

4        Petitioner filed her petition in this Court while her appeal to the Cowlitz Tribal Court of

5    Appeals was still pending. *See* Dkt. 1 at 12–16. As a result, Respondents argue that Petitioner's

6    claims are not properly before this Court, as Petitioner has failed to exhaust them in tribal court.

7    Dkt. 21 at 9–11. Respondents further argue that, exhaustion aside, Petitioner's claims fail on the

8    merits, and her petition should be denied. *Id.* at 11. The Court will address Respondent's

9    arguments in turn.

10       A.    Exhaustion

11       While parties generally are required to exhaust their tribal court remedies before

12    proceeding in federal court, this requirement is not a jurisdictional prerequisite and may be

13    excused under certain circumstances. *Boozer v. Wilder*, 381 F.3d 931, 935 (9th Cir. 2004).

14    Specifically, exhaustion is not required where "the action is patently violative of express

15    jurisdictional prohibitions, or it is otherwise plain that the tribal court lacks jurisdiction over the

16    dispute, such that adherence to the exhaustion requirement would serve no purpose other than

17    delay." *Id.* (cleaned up). Likewise, "exhaustion is not required where an assertion of tribal

18    jurisdiction is motivated by a desire to harass or is conducted in bad faith, or where exhaustion

19    would be futile because of the lack of adequate opportunity to challenge the court's jurisdiction."

20    *Id.* (cleaned up).

21       Petitioner concedes she has not exhausted her tribal court remedies, but contends

22    exhaustion should be excused because tribal jurisdiction is asserted in bad faith and because

23    exhaustion would be futile. Dkt. 1 at 12–16.

REPORT AND RECOMMENDATION - 6

1           1.    *Futility*

2          Petitioner argues exhaustion would be futile because the Cowlitz Tribe has "no

3    functioning appellate court." Dkt. 1 at 15. Petitioner cites *Krempel v. Prairie Island Indian*

4    *Cmty.*, 125 F.3d 621 (8th Cir. 1997) and *Johnson v. Gila River Indian Cmty.,* 174 F.3d 1032 (9th

5    Cir. 1999) in support of this assertion.

6          In *Krempel*, the plaintiff brought suit in state court against the Prairie Island Indian

7    Community. *Krempel*, 125 F.3d at 622. The Community removed the action to federal district

8    court and moved to dismiss on the ground that the plaintiff had not exhausted his tribal court

9    remedies. *Id.* While the district court granted the motion, the Eighth Circuit reversed, noting

10   that at the time the plaintiff had filed suit, it was undisputed that no tribal court existed. *Id.* at

11   622–24. The Community's tribal council did not contract to provide judges for the tribal court

12   until 36 days after service of the plaintiff's complaint and 15 days after the complaint's removal

13   to district court, and the tribal court did not become fully operational until more than two months

14   after removal. *Id.* at 622. Indeed, the plaintiff challenged "whether the tribal court [had] *ever*

15   become operational." *Id.* (emphasis in original). The Eighth Circuit highlighted that the

16   Supreme Court has required exhaustion of "*available* tribal remedies *before instituting* suit[,]" *id.*

17   at 623 (citing *Iowa Mutual*, 480 U.S. at 19) (emphasis in *Krempel*), and deemed it futile to

18   require a plaintiff to exhaust his tribal remedies at a time when a tribal court does not exist, *id.*

19   Per the court, "under the circumstances," a plaintiff who has filed a timely claim in an existing

20   forum, is not required to exhaust tribal remedies "at a later time when the tribal court [comes]

21   into existence." *Id.* at 624.

22         In *Johnson*, a petitioner attempted to appeal a tribal court decision to the tribal court of

23   appeals. *Johnson*, 174 F.3d at 1034. The petitioner filed a notice of appeal, requested the court

rules and additional information, filed briefing, and sent the appellate court a copy of the

transcript of the tribal court proceedings, which he had prepared at his own expense. *Id.* The

respondent filed a response brief, additional memorandum, and two motions in the tribal court.

*Id.* After initially responding to certain of the petitioner's inquiries, the court of appeals stopped

communicating with the parties. *Id.* at 1034–35. Two years after the petitioner filed his notice

of appeal, the court still had not issued a decision. *Id.*

The petitioner filed suit in district court, and the court dismissed for failure to exhaust.

*Johnson*, 174 F.3d at 1034–35. The Ninth Circuit, however, reversed and remanded, holding that

genuine issues of material fact were raised as to whether exhaustion of the petitioner's claims

would be futile. *Id.* at 1036. Per the court, while "[d]elay alone is not ordinarily sufficient to

show that pursuing tribal remedies is futile[,]" here, "the lack of a briefing schedule, scheduled

appellate argument, a meaningful response to the notice of appeal, or an answer to any of [the

petitioner's] correspondence for an abnormally extensive period create doubt that a functioning

appellate court exists." *Id.*

Petitioner, here, argues that, while "there may be a few scraps of tribal code relating to

appellate procedure, there is neither a panel of appellate judges, nor a clerk of the Court of

Appeals, nor a physical court-room, nor even a rulebook." Dkt. 1 at 15. Thus, under *Krempel*

and *Johnson*, Petitioner contends exhaustion is per se futile because there is no functioning tribal

court of appeals. *Id.* Petitioner further contends that because "there was no functioning court of

appeals at the time the Tribe filed the charges" against Petitioner, the construction of a

functioning court of appeals now, "after the trial and after the notice has been filed, is too late."

*Id.* at 16.

1    But in *Krempel*, the Eighth Circuit's holding, which it limited to the circumstances of the

2    case, was predicated on the fact that there was no tribal court in existence at all, not even a trial

3    court. *Krempel*, 125 F.3d at 622. *See also Comstock Oil & Gas Inc. v. Ala. & Coushatta Indian*

4    *Tribes of Tex.*, 261 F.3d 567, 572–73 (5th Cir. 2001) (excusing exhaustion as futile when no

5    tribal court existed and the tribe's constitution and bylaws did not permit the establishment of a

6    tribal court, meaning the tribal judicial code, which was adopted after the plaintiff's federal claim

7    had already been filed, was impermissibly created); *Findleton v. Coyote Valley Band of Pomo*

8    *Indians*, 27 Cal. App. 5th 565, 575 (2018) ("[T]here was no evidence . . . indicating there was a

9    tribal court in existence in 2012" when the plaintiff first filed his claim). At the time that the

10   plaintiff in *Krempel* filed suit, the tribe had taken steps toward the development of its tribal court

11   system by adopting a judicial code; however, that judicial code had yet to receive final approval

12   from the Bureau of Indian Affairs. *See Krempel v. Prairie Island Indian Cmty.*, 888 F. Supp.

13   106, 109 (D. Minn. 1995), *vacated*, 125 F.3d 621 (8th Cir. 1997). This indicated the tribal court

14   had never actually become operational, despite the tribe's efforts to staff the court after the

15   plaintiff's lawsuit had been filed. *See Krempel*, 125 F.3d at 622.

16   Here, it is clear that the Cowlitz Tribal Court system already existed at the time that

17   Petitioner filed her petition[4] and that the CTC and tribal ordinance provided for appellate review.

18   CTC 27.05.020; CTC 27.05.030; Dkt. 21-8. Petitioner does not argue that the Cowlitz Tribal

19   Court of Appeals is improperly constituted, nor does she cite any authority from which the Court

20   can conclude that the Tribe's staffing of the properly constituted court of appeals after Petitioner

21   filed her notice of appeal renders her appellate remedy unavailable such that exhaustion would

22

23   [4] Petitioner argues that "whether there is a trial court is debateable[,]" contending that some "track record of trying cases would be appropriate before the tribal council tries one of its adversaries in a criminal case [and] thereby threatens the defendant's Constitutional rights." Dkt. 1 at 15–16. This argument does not merit a response.

REPORT AND RECOMMENDATION - 9

1  be futile. *See Iowa Mutual*, 480 U.S. at 19 (requiring exhaustion of "available tribal remedies

2  before instituting suit").

3       Petitioner argues that "*Krempel* held that the judge must be hired *before* the claim is

4  filed." Dkt. 25 at 6. But the Ninth Circuit has held that a tribe revising its tribal code to appoint

5  a judge to hear a case that tribal code previously precluded the judge from hearing did not render

6  exhaustion futile, particularly where the adjudicatory process had continued in the tribal forum.

7  *See Grand Canyon Skywalk Dev., LLC v. 'Sa' Nyu Wa Inc.*, 715 F.3d 1196, 1203 (9th Cir. 2013)

8  ("Although [tribal law] originally precluded a judge pro tem from hearing condemnation cases,

9  the tribal court remedied this separation of powers issue by invalidating that section and

10  appointing a neutral pro tem judge to hear this case. The [tribal] adjudicatory process has

11  continued, as evidenced by submitted tribal court and tribal court of appeals orders. Both parties

12  to this appeal are participating in those proceedings."). So too, here, where the tribal council has

13  appointed appellate judges to hear Petitioner's appeal, and both parties to the appeal are

14  participating in the tribal appellate proceedings.

15       Petitioner contends that, regardless of the fact that the appeal is proceeding, the court of

16  appeals is so inadequate, incompetent, and nonfunctioning that exhaustion should be deemed be

17  futile. Dkt. 25 at 8–11. Petitioner argues the "following issues undermine the Cowlitz court of

18  appeals['] legitimacy and compromise [Petitioner's] Constitutional rights: 1) no designated clerk

19  of the court of appeals, 2) no publicly available information about the court of appeals, 3) [n]o

20  public defender, despite the Order of Indigency, 4) [t]wo chief appellate judges, 5) [one attorney

21  obtaining] an ordinance not available to [another attorney], and (6) [one attorney obtaining] the

22  scheduling order, [the other attorney] did not." *Id.* at 9.

23

1    Even assuming the facts marshalled by Petitioner indicate a degree of incompetency on

2    the part of the Cowlitz Tribal Court of Appeals, which the Court does not find, "[t]he alleged

3    incompetence of tribal courts is not among the exceptions to the exhaustion requirement

4    established [by the Supreme Court], and would be contrary to the congressional policy

5    promoting the development of tribal courts." *Iowa Mutual*, 480 U.S. at 19.   Only when

6    incompetency renders the court nonfunctioning should exhaustion be excused.  *See Johnson,* 174

7    F.3d at 1036.  The facts do not support such a finding here.

8    *Johnson*, on which Petitioner heavily relies, involved "a two-year delay" in waiting for a

9    briefing schedule, an argument date, or any meaningful response to the notice of appeal.  *See*

10   *Johnson*, 174 F.3d at 1036.  *See also Wounded Knee v. Andera*, 416 F. Supp. 1236, 1240 (D.S.D.

11   1976) (finding exhaustion should be excused when a petitioner filed an appeal and waited

12   approximately six months without action from the tribe).  By contrast, here, the tribal court has

13   remained communicative with Petitioner about the status and progress of her appeal, and the

14   court of appeals has already issued two orders to date, including a scheduling order that details

15   the rules and procedures governing the appeal—all within the first few months.  Dkt. 27 ¶ 9; Dkt.

16   21-4–21-5.

17   Finally, Petitioner argues exhaustion would be futile because the "tribal court of appeals

18   judges were hired by the very same people who testified *against* [Petitioner] at trial."  Dkt. 25 at

19   8 (emphasis in original).  Petitioner notes that the Tribe's five witnesses at trial were all members

20   of the tribal council and that the tribal council passed a resolution to hire the appellate judges.

21   *Id.*  But as Petitioner acknowledges, *id.*, the tribal council did so unanimously, *see* Dkt. 27 at 33.

22   "The vote was 15 – 0."  Dkt. 25 at 8.  Moreover, Cowlitz law provides that only the tribal council

23   can hire judges for tribal court.  Dkt. 21-8 at 3.  Thus, contrary to Petitioner's contentions, the

1  "circumstantial evidence," Dkt. 25 at 8, suggests the Tribe followed standard procedures when

2  staffing the court of appeals, and that the witnesses in question, who comprised only one third of

3  the voting members of the tribal council, did not exert controlling influence over the outcome of

4  the vote.

5        The futility exception to the exhaustion requirement applies narrowly to only the most

6  extreme cases, *Grand Canyon Skywalk*, 715 F.3d at 1203 (citing cases), and Petitioner has failed

7  to demonstrate that this case warrants its application.  Thus, her failure to exhaust her tribal court

8  remedies should not be excused on futility grounds.

9                2.    *Bad Faith*

10       Petitioner argues exhaustion should be excused on harassment and bad faith grounds.

11  Dkt. 1 at 14–15.  In order for the bad faith exception to apply, it must be the tribal court that

12  acted in bad faith, not the remaining Respondents.  *Grand Canyon Skywalk*, 715 F.3d at 1201.

13  The Court will therefore only entertain allegations of bad faith made against the tribal court

14  itself.

15       Petitioner alleges the tribal court acted in bad faith by going to extremes to "control every

16  aspect" of the trial, "preventing the attorneys from asking any questions around tribal politics[,]"

17  squelching "any testimony regarding the context from which the incident arose[,]" and "failing to

18  ensure that the proceedings were recorded . . . ."  Dkt. 1 at 14–15.  As explained below,[5]

19  however, Petitioner's evidence of bad faith fails on the merits.  Exhaustion should therefore not

20  be excused on bad faith grounds.

21       Because Petitioner has failed to exhaust her tribal court remedies, the Court may either

22  dismiss or stay this action pending the outcome of Petitioner's appeal in tribal court.  *Atwood v.*

23

_____

    [5] *See* section IV.B.3.

REPORT AND RECOMMENDATION - 12

1    *Fort Peck Tribal Court Assiniboine*, 513 F.3d 943, 948 (9th Cir. 2008).  Because the Court finds

2    that the petition fails to state a claim for habeas relief, this matter should be dismissed with

3    prejudice.

4         B.    <u>Merits Review</u>

5         Petitioner argues the Court should grant her habeas relief under ICRA because (1) the

6    tribal court did not maintain a recording of the trial; (2) systemic constitutional problems plague

7    the tribal court, and (3) the trial judge committed constitutional errors when conducting voir dire,

8    ruling on evidentiary issues, and issuing jury instructions.  *See* Dkt. 1 at 16–23.

9         ICRA extends to tribes most—but not all—of the civil protections of the Bill of Rights.

10   *Tavares v. Whitehouse*, 851 F.3d 863, 865–66 (9th Cir. 2017).  That being said, "except to the

11   extent demanded by the ICRA, the structure and procedure of tribal courts may be determined by

12   the tribes themselves."  *Selam*, 134 F.3d at 954 (cleaned up).  As a result, the "procedures that

13   the Tribal Courts choose to adopt are not necessarily the same procedures that the federal courts

14   follow[,]" and federal courts "must avoid undue or intrusive interference in reviewing Tribal

15   Court procedures."  *Smith v. Confederated Tribes of Warm Springs Reservation of Oregon.*, 783

16   F.2d 1409, 1412 (9th Cir. 1986).  "Comity towards the Tribal Courts requires that deference be

17   given to the procedures which those courts choose to follow."  *Id.*

18        In interpreting and applying ICRA, courts must "tread lightly in the absence of clear

19   indications of legislative intent" to honor their obligations to respect "tribal sovereignty" and

20   "the plenary authority of Congress in this area . . . ." *Santa Clara Pueblo*, 436 U.S. at 60.

21        / / /

22        / / /

23        / / /

1          1.      *"Whether this Court Should Grant the Petition for Habeas Corpus*

2                  *Because the Tribal Court Did Not Maintain a Recording of the Trial"*

3          Petitioner avers that her "detention is illegal because the tribal court did not properly

4  record the trial[,]" arguing the "right to a transcript is a substantial constitutional right."  Dkt. 1 at

5  16 (citing *In Re Woods v. Rhay*, 54 Wn.2d 36, 45 (1959)).  But ICRA requires a tribe to

6  "maintain a record of the criminal proceeding" only if the tribe "imposes a total term of

7  imprisonment of more than 1 year on a defendant . . . ."  25 U.S.C. § 1302(c)(5).  Because

8  Petitioner was sentenced to less than one year of imprisonment, Dkt. 15-2, the Tribe was not

9  required to maintain a record of the trial proceedings.  Thus, its failure to do so does not run

10  afoul of ICRA, nor does it entitle Petitioner to habeas relief.[6]  Petitioner cites no appliable

11  authority compelling a different conclusion.

12         2.      *"Whether this Court Should Grant the Petition for Habeas Corpus*

13                 *Because of Systemic Constitutional Problems in the Tribal Court System"*

14         Petitioner contends her detention is illegal because the victim and his witnesses hand

15  selected the trial judge and prosecutor specifically for her case, and because they will hand select

16  any appellate judges.  Dkt. 1 at 17–19.  While the petition does not explicitly identify which of

17  Petitioner's constitutional rights she alleges this conduct violated, the Court surmises she

18  primarily alleges violations of her due process rights.

19         Under ICRA, tribes shall not "deprive any person of liberty or property without due

20  process of law."  25 U.S.C. § 1302(a)(8).  In reviewing tribal court procedures to determine

21  whether they comport with this due process guarantee, "courts . . . [have] correctly sensed that

22  Congress did not intend that the . . . due process principles of the Constitution disrupt settled

23

---

[6] The Court also notes that the Tribe did maintain a record of the proceedings, *see* Dkt. 21-1—albeit one that Petitioner alleges is deficient.

1    tribal customs and traditions." *Randall v. Yakima Nation Tribal Court*, 841 F.2d 897, 900 (9th

2    Cir. 1988) (citations omitted).  Given this, defining the limits of due process protection under

3    ICRA "is not an easy process, because due process concepts are not readily separated from their

4    attendant cultural baggage; due process especially implies a number of particular procedural

5    rights derived from Anglo–American history." *Id.* (cleaned up).

6          Where the tribal court procedures under scrutiny differ significantly from those

7    "commonly employed in Anglo–Saxon society, courts weigh the individual right to fair

8    treatment against the magnitude of the tribal interest in employing those procedures to determine

9    whether the procedures pass muster" under ICRA.  *Randall*, 841 F.2d at 900 (cleaned up).  But

10   where the tribal court procedures parallel those found "in Anglo–Saxon society," courts need not

11   engage in this weighing of interests.  *Id.*  Instead, federal constitutional standards are employed

12   in determining whether the challenged procedures violate ICRA.  *Id.* (citations omitted).

13         Because the Cowlitz Tribal Court procedures largely parallel those utilized in state and

14   federal court, the Court will employ federal constitutional standards when assessing whether the

15   procedures comport with due process.

16                              a.    *Trial Judge*

17         Petitioner alleges the trial proceedings were "tainted by the appearance, or the actual

18   presence, of judicial bias" because the victim and his witnesses hired the judge, in violation of

19   Petitioner's constitutional rights.  Dkt. 1 at 17.  According to Petitioner, "[a]ssuming they

20   followed standard procedures, they literally sat on the hiring committee and interviewed her for

21   the job[,]" and selected a judge they thought would assist them in achieving their goal of

22   silencing Petitioner, their political opponent.  *Id.* at 17–18.

23

1    Contrary to Petitioner's contentions, however, the facts do not indicate impropriety in the

2    hiring of the tribal court judge.  The judge was appointed to serve on the Cowlitz Tribal Court

3    years prior to the September 2022 assault in question, and was reappointed by unanimous tribal

4    council resolution on more than one occasion.  Dkts. 21-6–21-7.  And Petitioner cites no

5    authority from which the Court can conclude that the Tribe's judicial hiring process—i.e., by

6    tribal council appointment, *see* Dkt. 21-8—itself runs afoul of ICRA's due process protections.

7    Petitioner attempts to recharacterize her judicial bias claim as one alleging the judge

8    infringed on Petitioner's right to present a defense.  *See* Dkt. 25 at 13–15.  For the reasons

9    explained below, *see* section IV.B.3, the Court finds that the judge did not.  Given this,

10    Petitioner's judicial bias allegations fail.

11    b.    *Special Prosecutor*

12    Petitioner argues that the victim and his witnesses, all of whom were members of tribal

13    council, hired the special prosecutor who tried the case against Petitioner, thereby violating

14    Petitioner's constitutional rights.  Dkt. 1 at 18–19.  Petitioner acknowledges that "we don't know

15    for sure how the private attorney was hired to be the special prosecutor" because the tribal

16    council works in secret, but argues that, regardless, the prosecutor's bias is evident because she

17    failed to investigate whether charges should have been brought against any of the other

18    individuals involved in the incident leading up to the assault.  *Id.* at 19.  Per Petitioner, "[n]o

19    state-court prosecutor would have brought these charges.  Said charges were an abuse of

20    prosecutorial discretion."  *Id.*

21    But as Petitioner recognizes, "Cowlitz does not have a prosecutor."  *Id.* at 18.  Thus, in

22    order to try the case at all, the Tribe was required to hire a special prosecutor.  Petitioner cites no

23    authority supporting her conclusion that the tribal council's role in appointing the special

prosecutor violated Petitioner's due process rights.  Indeed, as Respondents point out, "[t]his Court need only ask itself who appoints, for instance, the U.S. Attorney General or the various U.S. Attorneys to reject the Petition's claims about a lack of prosecutorial independence out of hand." Dkt. 21 at 15.  And Petitioner's allegations about the special prosecutor's conduct in investigating and charging the assault are based on nothing more than speculation.  She therefore fails to demonstrate that her prosecutorial bias claim entitles her to habeas relief under ICRA.

c.    *Appellate Court*

Petitioner argues any "appeal will be tainted by the same systemic bias or appearance of bias that tainted the trial" because "[t]here is no system in place to hire a panel of judges in an unbiased manner" and any "appellate judges will be hand-selected by [the victim] and his witnesses, in the same manner as the trial judge and the special prosecutor." Dkt. 1 at 19.  As previously discussed, however, the manner in which the tribal council hired the appellate judges does not give rise to the appearance of impropriety, nor does it suggest a violation of Petitioner's constitutional rights.  Petitioner cites no authority, save her own conjecture, to support the opposite conclusion.

Moreover, while it is true that, when a right to appeal is provided, "the procedures used in deciding appeals must comport with" due process, *Randall*, 841 F.2d at 900, here, Petitioner's allegations about her lack of a right to an effective appeal remain hypothetical, as the appeal has not yet progressed beyond the preliminary stages.  Petitioner cites nothing to support her contention that the alleged failings of the court of appeals—its lack of a designated clerk of court, for example—are so egregious as to violate her due process rights.  The appellate court's conduct thus far in granting Petitioner court appointed counsel and issuing a scheduling order

1    certainly does not imply due process violations.  Her arguments pertaining to appellate court bias

2    fail accordingly.

3            3.     *"Whether this Court Should Grant the Petition for Habeas Corpus*

4                        *Because of Constitutional Errors Specific to this Trial"*

5            Petitioner avers that constitutional errors specific to her trial—specifically, errors

6    committed by the tribal court when conducting voir dire, making evidentiary rulings, and issuing

7    jury instructions—entitle her to habeas relief under ICRA.

8                  a.     *Voir Dire*

9            Petitioner argues the tribal court judge committed constitutional error when refusing to

10    allow Petitioner's counsel to ask politically charged questions in an effort to determine potential

11    jurors' impartiality.  *See* Dkt. 1 at 19–20.  The Court construes this as a claim alleging violations

12    of Petitioner's right to an impartial jury.

13            The Sixth Amendment guarantees defendants the right to an impartial jury.  *See* U.S.

14    Const. amend. VI.  Respondents argue that ICRA, which gives criminal defendants a right "upon

15    request, to a trial by jury of not less than six persons," 25 U.S.C. § 1302(a)(10), does not extend

16    the Sixth Amendment's impartiality requirement to jury trials in tribal court, Dkt. 21 at 13.

17    While Respondents' arguments are well taken, the Court need not decide whether the jury right

18    afforded to defendants under ICRA mirrors that afforded to defendants under the Sixth

19    Amendment; regardless, the tribal court's voir dire comported with the Sixth Amendment's

20    protections.

21            Trial judges have "broad discretion" in "deciding what questions to ask prospective

22    jurors."  *United States v. Tsarnaev*, 595 U.S. 302, 313 (2022) (finding trial judge did not abuse

23    discretion or violate the Sixth Amendment when declining to ask about the content and extent of

each juror's media consumption about the Boston Marathon bombings).  Judges need not pose

every question suggested by counsel, but instead must "conduct a thorough jury-selection

process that allows the judge to evaluate whether each prospective juror is 'to be believed when

he says he has not formed an opinion about the case.'"  *Id.* (citation omitted).

To that end, the tribal court, here, endeavored to determine whether the prospective jurors

could remain impartial.  To account for the likelihood that members of the venire "may have

heard of" the case, the tribal court summoned "a heck of a lot more" prospective jurors than

tribal law required, and suggested that the parties "may want some more peremptory challenges"

to address these concerns. Dkt. 21-1 at 59.  The tribal court ultimately decided to summon 60

prospective jurors—10 more than Petitioner originally sought.  *Id.*  It also advised the

prospective jurors of their duty to keep an "open mind" at the beginning of voir dire and strove to

determine whether the prospective jurors were "unbiased and without preconceived ideas" to

ensure the case would be "tried before an impartial jury." *Id.* at 156.  The court excused every

juror who indicated he or she could not remain impartial, or who indicated a close relationship

with either Petitioner or the witnesses. *Id.* at 155–209.  By the end of voir dire, not a single juror

remained whom Petitioner had asked to strike. *See id.*

Petitioner contends the jury foreman had announced his candidacy for tribal council prior

to the trial and was endorsed by the victim of the assault. Dkt. 1 at 20.  According to Petitioner,

"[s]aid endorsement is, essentially, proof of bias." *Id.*  Petitioner argues that because the court

did not allow questions about tribal politics or political affiliation, she was unable to "ferret out

the juror's bias . . . ." *Id.*  But the court did permit Petitioner to ask whether "anyone here [was]

more likely to take the charges as credible cause of being brought by a Tribal Council

member[.]" Dkt. 21-1 at 190.  The court also provided "'emphatic and clear instructions on the

sworn duty of each juror to decide the issues only on evidence presented in open court.'"

*Tsarnaev*, 595 U.S. at 314 (citation omitted).  The court reminded the prospective jurors that it

was their duty "to determine the facts in this case from the evidence produced in court," Dkt. 21-

1 at 158, and that each juror must "keep an open mind until the case is submitted to you . . . and

base any decision upon the law and the facts uninfluenced by any other consideration[,]" *id.* at

156.  And all of the jurors swore under oath that they would "well and truly try the case and

declare a true verdict according to the evidence and instructions" given by the court.  *Id.* at 210;

*see also Jeffries v. Blodgett*, 5 F.3d 1180, 1189 (9th Cir. 1993) (finding that all jurors swearing

under oath that "they could impartially judge [the defendant's] guilt or innocence" weighed

against finding a violation of the defendant's right to a fair trial).  In sum, "the court's jury

selection process was both eminently reasonable and wholly consistent with [Supreme Court]

precedents." *Tsarnaev*, 595 U.S. at 315.  Petitioner's contention that the tribal court's voir dire

violated her constitutional rights is without merit.

b.    *Evidentiary Rulings*

Petitioner argues the tribal court judge's various evidentiary rulings—limiting a

demonstrative reenactment of the assault, barring the introduction of a 9-1-1 call, and limiting

evidence about tribal politics, for example—violated her constitutional rights. Dkt. 1 at 20–22.

The Court again surmises that in so arguing, Petitioner alleges violations of her due process

rights.

To the extent Petitioner challenges the constitutionality of the evidentiary rules employed

by the tribal court, this argument fails.  Nothing in ICRA suggests that specific evidentiary rules

are required in tribal court proceedings, and, as Respondents note, tribes take varied approaches

to evidentiary rules in their own courts.  Dkt. 21 at 16 (noting that the Cowlitz have adopted

1  Washington's Rules of Evidence, but not Washington courts' interpretation of those rules,

2  whereas the Colville apply the Federal Rules of Evidence, and the Lower Elwha Klallam Tribe

3  has adopted neither state nor federal evidentiary rules).  Petitioner cites nothing indicating that

4  this is constitutionally unsound.

5          To the extent Petitioner challenges the tribal court's evidentiary rulings as

6  misapplications of the Tribe's adopted rules of evidence, this raises a discretionary issue of tribal

7  law that is not cognizable in habeas.  *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (it is not

8  the province of federal habeas courts to re-examine state court conclusions regarding matters of

9  state law); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("federal habeas corpus relief does not lie

10  for errors of state law").

11          And to the extent Petitioner challenges the evidentiary rulings as themselves violative of

12  due process, the Court finds she has failed to allege sufficient facts to state a due process claim.

13  The due process clause "guarantees criminal defendants 'a meaningful opportunity to present a

14  complete defense.'"  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citation omitted).  However,

15  the right to present a defense is not absolute.  *Montana v. Egelhoff*, 518 U.S. 37, 41–42 (1996).

16  "[T]he accused, as is required of the State, must comply with established rules of procedure and

17  evidence designed to assure both fairness and reliability in the ascertainment of guilt and

18  innocence."  *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).  Accordingly, "'[t]he accused

19  does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise

20  inadmissible under standard rules of evidence.'"  *Egelhoff*, 518 U.S. at 42 (citation omitted).

21          The Constitution affords state courts broad latitude in regard to the exclusion of evidence

22  from criminal trials.  *United States v. Scheffer*, 523 U.S. 303, 308 (1998).  To support a

23  constitutional violation, a state court's decision to exclude evidence "must be so prejudicial as to

1    jeopardize the defendant's due process rights."  *Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir.

2    1990).

3           Petitioner challenges the tribal court's refusal to (1) allow Petitioner and her witnesses to

4    use the words "threatened" and "intimidated[,]" (2) allow Petitioner and her witnesses to testify

5    regarding their fraught relationship with the victim, (3) allow Petitioner to testify that she acted

6    out of her training as a trauma nurse, (4) allow unfettered testimony about the medical condition

7    of the woman Petitioner acted to defend, (5) admit the recording of a 9-1-1 call made by that

8    same woman after the assault occurred, and (6) allow a reenactment of the incident in the manner

9    most desired by Petitioner.  Dkt. 1 at 10–11; 20–21.  Petitioner fails to demonstrate how any of

10   the aforementioned tribal court rulings so prejudiced her as to jeopardize her due process rights.

11          For example, while Petitioner challenges the tribal court's refusal to allow her and her

12   witnesses to testify that they generally felt "threatened," "intimidated," "humiliated," "bullied,"

13   or "victimized" by the victim, she acknowledges that the court permitted them to testify to their

14   feelings at the time of the assault.  *See* Dkt. 3 at 4–5.  *See also, e.g.*, Dkt. 21-1 at 230–31

15   (providing that the witnesses could testify to how they felt at the time of the incident, including

16   by saying they "felt threatened," but could not bring in the "whole history" of the relationship

17   between the parties without "an offer of proof."); 241 (providing that a witness could testify to

18   her "feelings about how she perceived that situation . . . , as long as it doesn't use inflammatory

19   words.").  Petitioner alleges the words "fearful," "scared," and "frightened," which the court

20   permitted her and her witnesses to use, were inadequate because they were not "precise

21   synonyms with the forbidden terms."  Dkt. 3 at 5.  This fails to state sufficient prejudice to

22   Petitioner.

23

1    Further, while Petitioner contends the tribal court refused to allow testimony regarding

2    the medical condition of the woman Petitioner acted to defend, as well as testimony pertaining to

3    Petitioner's training as a trauma nurse, Dkt. 1 at 10; 21, the record indicates otherwise.  The

4    court permitted testimony on both subjects, Dkt. 21-1 at 93–98; 489–490, but limited such

5    testimony to prevent it from straying impermissibly into opinion testimony, *id.* at 99–100.

6    Petitioner fails to demonstrate resulting prejudice sufficient to state a due process claim.

7    Finally, contrary to Petitioner's contentions, the tribal court did not wholesale exclude

8    evidence of the 9-1-1 call in question, nor did it "spoil[] the reenactment without giving any

9    reason." Dkt. 1 at 21.  While the court refused to admit the 9-1-1 call on hearsay and

10   authentication grounds, it permitted the witness who made the call to testify to why the call was

11   made and how the witness felt at the relevant time.  Dkt. 21-1 at 536–39.  And while the court

12   limited Petitioner's reenactment of the assault to prevent unfair prejudice, it permitted Petitioner

13   to demonstrate, from her perspective, what happened during the incident in question.  *Id.* at 623–

14   24.  Petitioner has failed to demonstrate how these limitations were so prejudicial as to

15   jeopardize her constitutional rights.

16   Thus, Petitioner's contention that the tribal court's various evidentiary rulings violated

17   her due process rights does not state a claim for habeas relief.

18                           c.    *Jury Instructions*

19   Finally, Petitioner contends the tribal court committed constitutional error when adopting

20   a jury instruction on "defense of others" that omitted language indicating the Tribe bore the

21   burden of proving the absence of self-defense.  Dkt. 1 at 21–22.  In so arguing, Petitioner relies

22   on Washington state law, which provides that the state bears the burden of proving the absence

23   of self-defense beyond a reasonable doubt.  Dkt. 1 at 22 (citing *State v. Acosta*, 101 Wn.2d 612,

625 (1984)).  But the U.S. Supreme Court has rejected the claim that "requiring self-defense to be proved by the defendant is unconstitutional."  *Martin v. Ohio*, 480 U.S. 228, 236 (1987).  Petitioner's allegations therefore fail to allege a violation of her constitutional rights, and her habeas claim fails accordingly.

V.        CONCLUSION

For the foregoing reasons, the Court recommends that the petition be denied and this action be dismissed with prejudice.[7]  A proposed Order accompanies this Report and Recommendation.

VI.        OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14) days** after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **December 1, 2023**.


Dated this 6th day of November, 2023.


S. KATE VAUGHAN
United States Magistrate Judge

---

[7] "Habeas claims brought under the Indian Civil Rights Act, 25 U.S.C. § 1303, are most similar to habeas actions arising under 28 U.S.C. § 2241," § 1303's "federal law analogue."  *Kelsey v. Pope*, 809 F.3d 849, 854 (6th Cir. 2016), *cert. denied sub nom. Kelsey v. Bailey*, ⸺ U.S. ⸺, 137 S.Ct. 183, 196 L.Ed.2d 150 (2016).  Because the habeas petition is most similar to those habeas actions arising under 28 U.S.C. § 2241, a certificate of appealability is not included.